NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.— July, 1877.

## MATTER OF POLLOCK.

*In the matter of the final accounting of* CHRISTIAN H. LILLIENTHAL *and* EDWARD B. BROWN, *as executors of the will of* JANE POLLOCK, *deceased.*

Where a testator gave his estate to trustees and provided that certain contracts that he had made in his lifetime, and which were uncompleted, should be finished, and directed the trustees to make advances for the

purpose of completing such contracts, *Held*, that the profits on such contracts accruing each year were not "net annual income" of the estate and did not go to the person to whom such income was by the will directed to be paid, but formed part of the body of the testator's estate.

An executor having lost by theft certain securities (which represented the investment of a capital fund in which there was a life interest and a remainder over), was charged in his account with their market value at the time they were stolen.    *Held*, that the difference between the value of the securities at the time they were purchased and the time when they were stolen was not the "net annual income" of such securities, and did not go to the life tenant, but to the remainderman.

The fact that an executor or trustee, in his accounts, erroneously charges himself with sums of money, does not prevent him from afterwards, on his accounting, claiming that he is not properly chargeable with them.

Where a capital fund, in which there is a person having a life interest, is invested in securities, on which a premium is paid, the life tenant is not chargeable with such premium, and where the securities so purchased are exchanged for others of a greater value, the life tenant is not entitled to the difference in value between such securities as a part of the income of the fund.

Permanent improvements to property, in which there is a life estate, are presumed to be for the benefit of the estate, and are chargeable to the remainderman, and to overcome such presumption it is necessary to show that the life tenant made the improvements, or that they were made by his procurement and on his responsibility.

A life tenant made arrangements in respect to the plans and specifications of improvement for the permanent benefit of the estate, employed the architect to make the contract and superintend the work; all the items of expenditures for such improvements were regularly charged against the life tenant on the books of the executor, and some of the workmen employed on the improvements she paid herself.    The executor's books were within her examination, and copies of them were from time to time sent to her for examination, and she did not complain of the items being charged to her, and only complained of the amount of some of the items, and the balance of the account. *Held*, that these were facts sufficient to charge the life tenant with the expense of the permanent improvements.

Where a will directs the executors to allow certain persons to take certain property at an appraised, or the inventoried, value, this is not a specific legacy, and until the property is set apart to such persons, the executors are chargeable with its value.

Where articles of the testator's property are specifically bequeathed, and on the final accounting of the executor there is no evidence to show what has been done with such such property, the presumption is that they have been disposed of in accordance with the directions of the will.

*Quære,* whether there are not cases in which the strictness of the rule as to vouchers of payments required of executors and administrators, should not be relaxed.

Upon the hearing of exceptions to an auditor's report, the court is not bound to sustain or overrule the exceptions, but if it becomes satisfied that justice cannot be done in the case without the taking of further testimony, it may reserve the question of the exceptions and order further testimony to be taken.

THIS was a motion to confirm the report of the auditor on final accounting by Christian H. Lillienthal and Edward B. Brown, executors.

James Pollock, the testator's husband, died in 1856, leaving a will, by the third clause of which he gave to his wife, Jane Pollock, the net annual income of all his estate, for her natural life, subject to certain provisions made for his children, and charged his wife with the children's maintenance, support and education, and appointed her their guardian. After the death of his wife, he devised to his son, James Pollock, his house at Esopus, with the adjoining farm and a lot of wood land. By the fifth clause he gave $10,000 to each of his three children, to be paid to them when his son John J. should become twenty-one years of age, and in case of his death before that time, the payment was to be made to his surviving children, at the time when he would have attained that age, if he had lived.

By the sixth clause he directed that, after the death of his wife, the residue of his estate should be given to his three children, &c., and he appointed Christian H. Lillienthal and James Pollock executors, with leave to lease or sell, by public or private sale, any portion of his real estate, or any held in common, providing that none should be sold or partitioned during the life

of his wife without her written consent, and that the proceeds of his property not necessary to the execution of his will, should be kept invested on bond and mortgage.

The second clause of the will provided that any unfulfilled contracts which he held should be completed under the direction and supervision of his nephew, John Pollock, and he authorized his executors to make necessary advances for that purpose, and that John's compensation should be allowed him on settlement, according to an agreement between them.

The three children, residuary legatees, were Susan P. Lillienthal, Agnes Isabella Pollock, and John James Pollock.

Jane Pollock, the testatrix, died in 1870, leaving a will, by which she bequeathed to her three daughters, Jane Elinor (wife of James Pollock), Mrs. Lillienthal, and Agnes Isabella, "all currency belonging to her, or to which she should be entitled at her death, equally," and by the third clause of her will she gave all the stock, tools, &c., at Esopus, at the inventoried value, to either of her daughters, or their husbands, or the heirs who should live therein.  By the fourth clause she gave her furniture, &c., to her three daughters, equally; fifth, to Jane Elinor, a watch; sixth, to Agnes Isabella, her library, &c., and to her and Mrs. Lillienthal, $300 each; eighth, certain portraits to Agnes Isabella; ninth, all her real estate she divided between Mrs. Lillienthal and Agnes Isabella, equally, according to the wish of their father; tenth, the residue one-third to Mrs. Lillienthal, one-third to

Agnes Isabella (Mrs. Brown), and the other third to the executors to invest, and pay over the income to Jane Elinor during her life, and at her death to her children, equally, and in case she left no children, then to Mrs. Lillienthal, and Mrs. Brown, and their heirs; and she appointed Mr. Lillienthal and Mr. Brown, her sons-in-law, executors.

The account, as rendered by the executors, shows a balance of $6,785.62 disbursements in excess of receipts, but the report of the auditor finds due from the executors $53,091.50, and bears date November 6, 1875, subject to the commissions of the executors, expenses of accounting, &c.

It appeared that John Pollock, one of the executors of James Pollock's estate, died December 10, 1857, and that the executor Lillienthal administered the estate thereafter.

The objectors claimed, particularly the special guardian for the infants, Ida L. Pollock and John J. Pollock, that the profits arising from the completion of the contract mentioned in the will, were income, and that the testatrix was entitled to the same as such, which claim was disallowed by the auditor, and the said guardian excepted thereto. The auditor rejected a large number of items of alleged disbursements by the executor, on the ground that neither sufficient vouchers nor proofs were furnished. He also rejected about $13,000 of charges and vouchers for expenditures for dock improvement, buildings, improvements, &c., at Esopus, which was held not chargeable to the life tenant, because they were permanent improvements, chargeable to the remain-

derman, and on the ground that the evidence did not support the allegation that the life tenant (the testatrix) made the improvements at her expense, to which disallowance the executors filed exceptions.

The auditor allowed certain checks of the executor payable to J. Pollock or bearer, and J. P. or bearer, which allowance was excepted to by the guardian aforesaid, and he rejected a series of checks drawn by the executor, payable to himself, order or bearer, to Edwin B. Brown or E. B. Brown, as not authorized, nor made on account of, decedent, or for her benefit, but mistakenly applied in payment of the improvements at Esopus, which checks, thus rejected, amounted to several thousand dollars. He also disallowed certain charges for interest paid by the executors on a loan of money, for the benefit of the decedent, both of which disallowances were excepted to by the executor.

The auditor also charged the executor with the profits or increase of certain government securities, as a part of the net income belonging to her, amounting to $7,846.86, to which charge the executor excepted.

LUCIEN BIRDSEYE, *for executor.*

WM. MCDERMOTT, GEO. W. BLUNT, *and* IRA SHAFER, *for objectors.*

THE SURROGATE. — The first exception which I desire to consider is that of the infants, Ida L. and John S. Pollock, that the auditor erred in not allowing to the estate of testatrix, and charging the executors with, all the profits realized from the several contracts taken in the name of, and by, James Pollock, a nephew of the testatrix, amounting to over $160,000.

The will of James Pollock provided that certain contracts, which should remain unfulfilled at his decease, should be completed by his nephew, John Pollock, and he authorized his executors to make the necessary advancements for the purpose of such completion, and by another provision of his will, he gave to his wife Jane (the testatrix in this matter) " the net annual income " of his estate, real and personal, for life, subject to certain dispositions, thereafter named, in favor of his children.

It is claimed by counsel for the infant objectors that the term " net annual income " embraced whatever profits were realized upon these contracts, and belonged to the testatrix.    This claim seems to me to be so unreasonable and unjust, that it is really difficult to form an argument opposed to such a proposition. When the executors were authorized to make advances from James Pollock's estate, to complete these contracts, as I understand the evidence, considerable progress had been made in them at the death of the decedent, and the difference between the amount realized thereon and the amount advanced to complete them, constituted, within the contemplation of the testator, the profits, which profits obviously became part of the body of the estate, and was in no sense the " net annual income " of the estate.    It was of the estate itself, from which was to be derived the annual income.

Suppose that instead of the contracts in question to be completed, he had directed the investment of all his property in the purchase of real estate, with directions to the executors to sell the same at a time

to be fixed, could it be claimed, for one moment, that the profits of such a sale would not belong to the estate, but could be claimed by the life tenant, so-called, who was only entitled to the annual income?

Suppose there had been a hundred thousand dollars loss on those contracts, instead of over $160,000 profit, would Mrs. Pollock have been compelled to sustain that loss, except so far as it reduced her income by reduction of the principal of the estate? If so, then she might have been deprived altogether of the net annual income of the estate, because the net income would have been more than exhausted in repaying those losses, and the mere statement of the proposition seems to me to carry with it its obvious refutation.

Numerous authorities have been cited by the counsel for the infants to the effect, in substance, that a trustee, executor, or guardian, or any other person standing in a like relation to another, may be made to account for any and all the profits made by him in any of the concerns of his trust, or by embarking the trust funds in trade. If trust money be laid out in buying or selling land, and a profit made, that profit shall not go to the trustee, but to the *cestuis-que-trust* whose money has been thus applied; but these are cases simply to show that the executors, if they had advanced the money of the estate for the purpose of completing the contracts in question, and made a profit, they would be answerable to the *cestuis-que-trust*, to wit: to the estate for the aggregate amount of the profits, and to the life tenant for the annual income thereon. But the expenditure in this case was

under the direction of the testator, James Pollock. It was equivalent to an incumbrance on the estate created by him, and the estate was credited the amount of the profits, and the *cestuis-que-trust* realized the benefit thereof, in conformity to the scheme of the will.

If the testator had intended the profits to be realized out of the completion of these contracts, should form a part of the " net annual income " of his estate, and go to his wife, it is altogether probable that he would have so said; and this argument does not involve, as the special guardian seems to suppose, the absurdity of holding that the advances were not made out of the estate, but were made from the profits of the contract.

The numerous authorities cited by the special guardian upon this point, only go to sustain the principle enunciated in 1 *Story's Equity Jurisprudence,* section 465, that a trustee, executor, or guardian may be made to account for the profits made by him in any of the concerns of his trust, except those hereafter noted; but the admission of that principle does not contribute at all to establish the doctrine contended for by the special guardian, for that principle would be fully vindicated by the executor accounting for the profits realized from the contracts to those parties entitled to the principal of the estate. But he also cites Johnson *v.* Johnson (5 *English Law and Equity,* 164); Price *v.* Anderson (15 *Simons,* 473); Bartley *v.* Wainwright (14 *Vesey,* 66); Ware *v.* McAndlish (11 *Leigh,* 595); and Matter of Woodruff (1 *Tucker,* 58), which held, in substance, that a

life tenant is entitled to any extraordinary dividend declared by a corporation upon stock, to the income upon which the life tenant is entitled. He also cites, to the same effect, the case of Cogswell *v.* Cogswell (2 *Edw. Ch.*, 240), where the Vice-Chancellor held that whatever advantage resulted from an increase of the annual value of the property, in consequence of the lots in question having become more valuable, the life tenant is entitled to, but that case was one as to ordinary dividends.

Surrogate Tucker, in the Matter of Woodruff (above), stated that the case of Clarkson *v.* Clarkson (18 *Barb.*, 646,) met the question involved, on all points. That case was where two-fifths of decedent's estate was given to his executors, in trust, to pay the interest, dividends, and proceeds, from time to time, as they should be received, to his two daughters during their lives. The trustees invested $12,600 in the Utica and Schenectady Railroad Company, by purchase, and subsequently invested $6000 more in the stock of Mohawk Valley Railroad Company, at par. The Utica and Schenectady Railroad paid an annual dividend of 10 per cent., which was paid to the *cestuis-que-trust.* Subsequently an extra dividend of 10 per cent. on stock amounting to $6000 was paid to the trustees. Afterward the two railroad companies were consolidated, under act of the legislature, into the New York Central Railroad Company, and the trustees holding the stock of the said companies in lieu thereof, became entitled to, and received, of the capital stock of the new company an equal number of shares ; also in bonds or certificates of the

New York Central Railroad Company, $55 on each share held in the former companies, which amounted to $12,100. The *cestuis-que-trust* claimed that they were entitled to the extra dividends of $6000, and the interest, and dividends arising therefrom, and also to the bonds and certificates, and asked the order of the Supreme Court that the trustees pay over the same. It was held that, by the terms of the will, the testator intended that all the gains, profits, income, and proceeds of the two-fifths of the estate should go to his daughters, as tenants for life, and that the $6000 belonged to them, and the trustees were decreed to account for it, and the income and dividends, or the increase received thereon, and this holding was based upon the broad language of the will, and that the extraordinary dividend was included in word "dividends," used in the will; but as to the bonds or certificates of the New York Central Railroad Company, it was held that they were not paid to trustees either as the interest, dividends, or proceeds, but as the difference between the value of the stocks of the old railroad corporations and the new, and were therefore to be regarded as capital, except the sixty shares difference, and that the shares of the new company, over those of the old, should follow their principal, and go to the *cestuis-que-trust*; but I am unable to perceive any analogy between these cases and the case under consideration, upon the point under discussion, and whether they are analogous on the points to be considered in respect to the auditor's allowance of the increased value of the national securities, will be the subject of future consideration.

I am therefore of the opinion that the auditor was right upon this claim, and the exception untenable, and that the report should be confirmed in that respect.

The next question, which is somewhat analogous to the one just considered, is that of the allowance of $7,846.86, as belonging to the life tenant, and charged to the executor as profits arising from the investment in government securities, by which is meant that the funds of the estate were invested in United States securities by the executors of James Pollock, deceased, which securities, to the amount of $75,000, were deposited in the Ocean Bank, and from thence burglariously taken and lost to the estate, and the amount charged to the executor by the auditor, as profit upon such securities, and as belonging to the life tenant, Mrs. Pollock, was the difference in value between the securities, as purchased, and their alleged market value at the time they were so taken, and this allowance by the auditor seems to be based upon the authorities above cited, holding that the extraordinary dividends declared upon the stock, the dividends, and interest upon which were payable to the life tenant, were also payable to this life tenant.

In Johnson v. Johnson (above cited) the testator gave his trustees certain insurance stock for the benefit of his wife for life, and after her death to his children. Two years after the death, the insurance company declared a bonus, or increased dividend, to be added to the usual dividend, and it was held that such bonus was due to the life tenant, as income.

In Price v. Anderson (above) the testator gave to

his daughter, during her life, the dividends, or interest, of £25,000 reduced annuities, and the dividends, or interest, of whatever stock he might possess in the Royal Exchange Assurance Company. The Assurance Company thereafter declared a dividend of twelve pounds, ten shillings per cent. on the capital stock. It was held that the tenant for life of the stock was entitled to the whole amount of the dividends, because the company declared it to be dividend, and not capital.

In Bartley *v.* Wainwright (above cited) the testator directed £10,000 to be invested in bank stock by his executors, for his daughter, she to receive the dividends and interest thereof during life, in addition to the half-yearly dividends. An additional dividend of $5 per cent. was declared, and it was held the *cestui-que-trust* (the life tenant) was entitled to the additional dividend.

In Ware *v.* McAndlish (above) the testator bequeathed one-fourth of the *residuum* of his estate in trust for his daughter, for life. It was held that she was entitled to the profits of the estate bequeathed, and that no part thereof should be carried to the principal fund, but the profit should be paid to her. But the only question involved in this case was, whether the life tenant was entitled to the whole income, or only to so much as would be sufficient for her support, and the balance should be invested, whereof she should enjoy the life estate only.

In the Case of Woodruff (above) the testator made a specific devise to his daughter, a life estate in the *residuum* to his widow, the remainder over to his

sons. The executors received of the assets certain shares of the Manhattan Gas Light Company. Two days after testator's death, the legislature authorized an increase of the capital stock from two to four millions. The corporation apportioned the new stock among the stockholders, and declared an extraordinary dividend out of the surplus profits of the corporation, of $18 per share, and allowed this amount to the credit of each stockholder who should take the new stock, as payment on account of it. It was held that the $18 per share was income of the estate.

In Simpson v. Moore (30 *Barb.*, 637,) the will directed the executors to invest one-sixth part of the estate, and pay over the income to the widow, during her life. The trustees invested a portion of the fund in the stock of the National Bank. The bank charter expired, and it was reorganized under the general law, preparatory to which it declared a dividend over and above the value of the stock of 18 per cent., with the option to the stockholders to take it in new bank stock, or in money. The trustees elected to take it in stock. It was held that the testator intended the income of his property, which he ordered to be converted, to be paid to his wife, but the capital to be preserved, and that the 18 per cent. should be considered as dividend, but as it contained part of what was held as capital when the stock was purchased, so much as was necessary to make the original investment should be retained by the executor, and the residue belonged to the life tenant.

Upon such consideration as I have been able to give this case, I cannot find any authority to sustain

the auditor in his charging the alleged profits of the United States securities lost, to the executors, as belonging to the life tenant, Mrs. Pollock. The various cases cited are cases where dividends have been declared as such, or profits realized from the use of the principal fund, but no case has been presented where the life tenant was adjudged to be entitled to the increased value of the principal of the estate, with the income thereof, much less in a case where there has been no disposition of the property, or realization of the profits. When the capital fund was invested in national securities, it remained the same capital fund, though it increased in market value. In no sense, as it seems to me, could that increase be adjudged as " net annual income," which presupposes the profits received for its use.

Suppose the life tenant had died before the securities were stolen, or suppose they had not been stolen, could she have compelled the trustees to pay over to her the amount of increase in the value of those securities? Suppose she had died, and her representatives had called upon the trustees for what was alleged by them to be the increased value of the securities in which the principal sum was invested, would it be tolerated for a moment that they could recover that alleged balance, as though the investment had been made exclusively for her benefit?

Suppose, again, the estate had consisted of a farm, to the income of which Mrs. Pollock was entitled by the will; and by ordinary increase of the value of the real estate, or by some local improvement, it became greatly enhanced in market value, could the life tenant claim all such increase?

Suppose the securities in question had depreciated 50 per cent., and this is upon the assumption that the investment in those securities was authorized by the will, or law, would the life tenant be chargeable with their depreciation, in addition to the loss which she would sustain by reason of the reduction of the income?

I know it is claimed that the investment of the funds of the estate by the executor, Lillienthal, was contrary to his duty, and that therefore he is liable to account for any profits that he may have realized, and liable for any losses which were sustained by reason of the unlawful investment; but he is only liable to the parties entitled to the fund, and the effect of an improper investment does not make him liable to the life tenant as to any portion of the fund that he would not be liable for, if the investment had been made conformable to the will, or the law of the land.

Indeed I am not able to perceive how the auditor distinguishes between the case of the profits on contracts and the alleged profits on the government securities, for it seems to me that if there is any difference, it is in favor of the profits actually realized and received, as against any alleged profits never estimated, fixed or realized.

It is claimed that because Mr. Lillienthal, when he purchased the securities, charged to the life tenant, Mrs. Pollock, the premium paid therefor, and because, in his account as executor of James Pollock, he recognized his liability to account for the increased value of the securities lost to the life tenant, he is chargeable therefor in this accounting.

I am entirely unable to appreciate the force of this logic. When he charged the life tenant for the premium paid for the investment, he evidently mistook the liability of the life tenant for such premiums, and when he recognized his obligation to account to the life tenant for the increased value of the securities lost, he equally forgot the legal rights of the other parties (the remaindermen), who were entitled to the increased value of the securities; and because he made that mistake, he cannot be held accountable — contrary to equity, law, and logic, for the fund which obviously belongs to the *cestuis-que-trust* and remaindermen in this estate, and his charging in the one case and crediting in the other, does not change either the rules of law, or the principles of equity, or justify the violation of either in their administration.

I am of the opinion that the exceptions to the auditor's report, filed by C. H. Lillienthal, the executor, are well taken, and that the auditor's report should be modified in respect to the charge against the executor, of the alleged profits upon the stolen securities.

The counsel for the executor objects to the charge of $3,498, and of $875, amounting to $4,373, under date January 19, 1869, against the executor, Lillienthal, for premiums on $33,000 of five-twenties of 1862, and $10,000 of 1867, which charge was, as I understand the account and testimony, derived from the following transaction: Mr. Lillienthal purchased $33,000 of United States bonds, and paid premiums for them of $562.50, and charged that premium to the life tenant, and subsequently he exchanged those

securities for others, and he received in the others, including a small amount of cash, in the aggregate, $37,060.62, making the difference of $4,060.62, from which he deducted the amount of premiums paid originally for the securities thus sold, leaving the sum of $3,498, as above stated, and under date of January 19, 1869, he charged that sum to himself, together with $875, increased value of $10,000 of bonds paid to Mrs. Lillienthal, and as the account appears, and the testimony shows, he subsequently, on the 12th February, 1870, credited to himself the amounts, on discovering, as he claims, that the life tenant was not entitled to such premium or increase.

The auditor charges the executor with this sum, according to his account, but does not allow him the charge of the same amount made against the life tenant, which, it is claimed, results in that amount of error, and, if I correctly understand the transaction, I see no reason why the life tenant should have been charged with the premium paid for the securities in which the principal fund was invested, and to the net income of which only she was entitled, and it seems equally clear to my mind that the life tenant was not entitled to the difference in value between the two securities on the exchange, but was only entitled to the interest derived therefrom, and that the auditor's report, in that respect, should be modified, though it is quite probable that the manner of making up the account may have misled the auditor. But I cannot concur with the counsel for the executor when he states, in his argument, that so far as there was a premium paid on the purchase of the securities, that

the charge should have been made as against this account, if, by this account, he means the account of the executors of Jane Pollock, under consideration, for over-premium which the executors saw fit to pay, for the securities could not, with propriety, be charged to the life tenant, but only the principal fund.

The next question of special importance in this case is the disallowance, by the auditor, of the various charges to the testatrix, for expenses of the improvements made at Esopus, which seem to have been disallowed upon the ground that there was no authority given to the executor by the testatrix to apply her income for the purpose of making such improvement, and that the improvements were not in the nature of repairs, but permanent and substantial betterments to the estate, and should be borne by the remaindermen.

It is undoubtedly true that as to permanent improvements of property, in which a person has a life estate, the expenses of such improvements are presumed to be for the benefit of the estate, and chargeable to the remaindermen, and to overcome such presumption, it is necessary to show that the life tenant made the improvements, or that they were made by his procurement, or on his responsibility.

[After reviewing the testimony upon this subject, the Surrogate proceeded:]

The fact that Mrs. Pollock had, from time to time, a statement of her account, which embraced the expenses of the improvements at Esopus, and none of the numerous witnesses called are able to state that she complained of such charges, but that her complaint was confined to the balance, as stated, and the

particular items of credit, and that several of the
witnesses testify . that she made arrangements in
respect to the plans and specifications of the im-
provements, employed the architect to make the
contracts and superintend the work, and that all the
accounts were furnished, and the repairs are found to
be charged against her in respect to these dealings,
and that in some of the improvements she paid the
workmen herself, and that these items were regularly
charged against her upon the books of the executor,
Lillienthal, which were within her examination, and
copies of which were, from time to time, sent to her
for examination, and that these circumstances are only
contradicted by James Pollock, who testified under the
feeling in behalf of his wife as a claimant, and possibly
the dissatisfaction over his discharge as book-keeper,
and the fact that he, as book-keeper, under the
direction of the executor, Lillienthal, made these
charges against the testatrix, offered very strong, if
not conclusive, evidence that Mrs. Pollock undertook
to make, at her own expense, the improvements
at Esopus, especially when taken in connection with
the fact that both Mr. Brown and Mr. Lillienthal testify
that they never directed any such improvements, and
there is no evidence that either of the life tenants did
so; beside, it is difficult to believe that, for a long
series of years, these charges had been made against
Mrs. Pollock, and she obviously was aware of them, if
the testimony of James Pollock be accepted as true,
denied the propriety of the charges, which were never
corrected, nor any adjustment made in respect to
them, she would still, with the knowledge of those

alleged false charges, amounting to over $13,000, make Mr. Lillienthal, who was alone responsible for such alleged false charges, the executor of her will. And while, from such examination as I have been able to give this case, I am not satisfied that I can do justice to the parties, and therefore ought not to pass finally upon the question of the liability of the life tenant for those expenses, as additional proof may be offered in the case, if I should deem it my duty to send it back to an auditor; yet it seems to me proper that I should consider the force of the evidence which has already been given, and which would lead me to hesitate to confirm the report in respect to that disallowance by the auditor.

There are numerous exceptions to the auditor's report, which it is somewhat difficult to pass upon in the present condition of the testimony, one of which is, that the auditor erred in disallowing the interest paid by the executors for the purpose of borrowing money for the decedent. If, as is claimed by the executor, it was necessary to make a loan to meet the advances to the life tenant, because of the expenditure of her income in making the improvements at Esopus, then the charge would seem to be proper; if, on the contrary, as the auditor has found she was not chargeable with these expenditures, there remained sufficient income in the hands of the executor for her use, then the charge was properly disallowed. But according to the view which I am constrained to take of this case, that question cannot now be safely determined.

Of the same character is the first exception taken by the guardian of Ida L. and John Pollock, that the

auditor failed to allow interest on the amount found in the hands of the executor at the time of the death of Mrs. Pollock, the life tenant. If the auditor is right in his finding, and the executor had that amount in hand at the time of her death, then the executor would seem to be chargeable with interest thereon, after the expiration of eighteen months after he received letters testamentary, unless some special circumstances, such as the necessity of retaining a portion to meet the expenses of the estate, or an effort to invest, and the failure to find securities recognized as proper for such investment existed; but that circumstance must be determined upon the ultimate determination of the whole case.

The special guardian for the infants also excepts to the report of the auditor, in that he disallowed the interest on certain payments made to John Pollock, prior to the completion of the contracts mentioned in John Pollock's will.

This exception is based upon the theory that John Pollock, under his contract with James Pollock, deceased, was not entitled to any portion of his compensation until after the completion of the contracts, and the profits thereon should be ascertained; but I am not disposed to hold that the receipt of something, on account of such profits, in the progress of their completion, would be either contrary to the letter or spirit of that contract.

The will of the decedent, Mrs. Pollock, by the third clause, states that it is her desire that the privilege of purchasing, at their appraised or inventoried valu- ation, all the stock, tools, utensils, horses, carriages,

harness, &c., at Esopus, to be given to any one of said daughters or their husbands who shall retain and live at said country seat, and the fourth clause gives the furniture, carpets, cornices, china ware, glass, pictures, ornaments, works of art, silver, silver plate, jewelry, wearing apparel, all out-door seats and vases, excepting such articles as she otherwise bequeaths to her said three daughters, to be equally divided between them, at their appraised or inventoried valuation.

It does not appear in the testimony whether any of the articles intended to be disposed by the third and fourth clauses, belonged to the estate of James Pollock, deceased. If so, it was given by his will to his two daughters, Mrs. Lillienthal and Agnes Isabella, and John James; but the inventory seems to treat it as the property of Jane Pollock, deceased, and it is set down at $6,382.75, and by the auditor is charged to the executors on this accounting.

It is claimed by the counsel for the executor, Lillienthal, that the full amount of this inventory should not have been charged to the executor, for the reason that the will made a specific disposition of such property, and that it never came into the hands of the executor, and that it went into the possession of the daughters, Mrs. Lillienthal and Mrs. Brown, and, if I understand his argument, it is that Jane Elinor, a daughter of the deceased by a former husband, was not entitled to any portion. This would doubtless have been so if the property had been been that of James Pollock, deceased, and bequeathed to his children; but if, as it seemed in this accounting, it was property bequeathed to Mrs. Pollock, at her decease

she made disposition of it to her three daughters, equally, at an appraised or inventoried valuation, but until that appraisal was made, and the property set apart to the respective daughters, the executor must be held to have control over it, and answerable for its valuation, for it is not specifically bequeathed so that the title and the right to the possession vested immediately in the legatees, but something was to be done, to wit: the appraisal, and distribution according to the appraisal, in order to complete the title, and to divest the executors of control over it, and the liability for it as such executors.

So far as concerns the stock, tools, utensils, horses, carriages, harness, &c., which was to be taken by the daughter who would occupy the premises at Esopus, Mrs. Brown seems to be entitled to the property, but she is liable to the executors therefor, and it was their duty to have procured an appraisal, and collected the appraised value from her, and I am unable to see how the executor can escape his liability for such property, at its appraised value, and the learned counsel for the executor I think has fallen into an error in supposing that there is no evidence but that the property in question was distributed to and received by, the respective legatees in conformity to the will.

Mr. Lillienthal testifies that the silver was equally divided between Mrs. Brown and Mrs. Lillienthal, and that the furniture and other articles, which were in the house at the time of Mrs. Pollock's death, were still in the house, and in the use of Mrs. Brown, and, as the evidence stands, it seems to me that the inventoried valuation of the furniture, &c., is properly charged to the executor.

As to certain articles specifically bequeathed and excepted from the above provisions, such as the watch to Jane Elinor, library, books, book case, library furniture and library carpet, curtains, &c., and certain napkin rings to Mrs. Brown, there is no evidence as to what has become of those articles. The reasonable presumption is, that they have gone conformably to the provisions of the will, and therefore should not have been charged to the executor, and in that respect the auditor's report is erroneous; but there is no evidence as to the valuation put upon that particular property by the appraisers, and further testimony upon that subject will be necessary in order to determine the amount of that error.

One objection made by the learned counsel for the executors, is that the parties to these proceedings are estopped from any claim made against the executors by the decree entered in the James Pollock estate, which would undoubtedly be true, had that final settlement been made, on due notice to all parties interested, and the decree given in evidence in these proceedings; but I have examined the testimony with great care, and I find no evidence that there ever was any such decree, and if there were, it does not appear to have been legally brought to the knowledge of the auditor, and hence cannot be considered on a motion to confirm this report.

This undoubtedly was a grave oversight, both in respect to the accounting by the executors of James Pollock's estate, on citation of all parties, and the neglect to give the decree in evidence in this proceeding, as a conclusive adjudication of the amount to

which the fund of Jane Pollock was entitled, and with which the executors of the estate were chargeable.

It is true that the account of Christian H. Lillienthal, surviving executor of James Pollock, deceased, was given in evidence in these proceedings, or, rather, it seems to have been admitted in evidence for a specific purpose, and the entry in respect to it can be found in the minutes of the testimony taken before the auditor, under date of October 7, 1874, and it is as follows: "Contestant admits that the statement of the account of money received by the executor is correct, with the exception of the items specified by James Pollock in his evidence." This admission I understand to relate to moneys received, as stated in the account of the executors of Jane Pollock, under consideration. The entry proceeds as follows: "And also that the executors of James Pollock, deceased, received various sums stated as having been received by them in the account rendered by them of the estate of James Pollock; also, that the executors of James Pollock paid out the various sums stated as having been paid out by them in the account of James Pollock's estate, except the items stated to have been paid to Mrs. Lillienthal, Mrs. Brown, Jane Pollock, Mr. Lillienthal, and Mr. Brown."

By contestant, in the above admission, I understand Jane Elinor Pollock, and the admission seems not to affect the contestants, the infants, and the account itself does not seem to be marked as an exhibit in the case, nor does it appear to have been offered in evidence by either of the parties, yet the admission seems to be based upon the theory that the account is in

evidence, but it could not be admissible in evidence except on consent, for it appears to be the account as rendered by the surviving executor without any authoritative determination as to its correctness.

There is no suggestion that it has ever been passed upon by an auditor, or surrogate, nor is any decree relating thereto, presented before the auditor for consideration; certainly none appears in the proceedings submitted to this court on this motion to confirm the auditor's report; and yet it is very difficult to understand why any allusion was made to that account, and an admission made by contestant, for it was merely an admission as to the receipt of various sums of money by the executors of James Pollock's estate, which it was incumbent upon them to account for, and if any *admission* on the subject of its receipt was necessary, such admission would seem to be necessary on the part of the executors, for it was an admission, so far as receipts were concerned, for the benefit of the contestant, and hardly appropriate as an admission by him; beside, the admission does not state that such moneys were received on the account of, and for, the life tenant, and, for the purpose of this proceeding, it becomes necessary to ascertain whether such receipts were on account of, and for the benefit of, the life tenant.

In respect to the latter clause of the admission that the executor paid out the amounts as stated in the James Pollock account, it is claimed by contestant's counsel that the admissions are not operative, because not joined in by the infants, and these admissions reserved the major part of the items, which, it seems

to me, should have been charged as having been paid to Mrs. Lillienthal, Mrs. Brown, Jane Pollock, Mr. Lillienthal and Mr. Brown. It is said by the same counsel that, while the admission was to the effect that the executor of James Pollock had paid out the sums named, yet it was not an admission that they were chargeable to the life tenant. If this were so, the admission, so-called, was worthless, for the same evidence that would have proved that the particular items were proper charges against the life tenant, would prove their payment, and I am not willing to believe that counsel were thus trifling with so important a question.

The fact was that, as Mrs. Pollock was entitled to the net annual income of the estate of James Pollock, it was necessary, in order to show what the receipt of the net income was, to prove all necessary disbursements in its administration, as well as the moneys paid out for necessary improvements, &c., and therefore, practically, the accounting of the James Pollock estate was an accounting, so far as the disbursements were concerned, in respect to the claim of the life tenant, and I think, therefore, the reasonable construction of that admission is that the disbursements, or payments, made by the executors of the James Pollock estate, were proper charges on the accounting in this estate, and were doubtless made because there had been no adjudication on the final settlement of the account of the James Pollock estate. But the literal interpretation of the admission would admit nothing practically which the party pretending to admit could require to be proved in this proceeding, and it is very difficult to

understand what was the object of the admission that James Pollock received the various sums stated in this account, for all the receipts by the executors herein, were covered by the testimony of James Pollock, and the admission that the account rendered in this proceeding for moneys received, and the receipts by the executors of James Pollock, if not chargeable to the life tenant, were immaterial in these proceedings, and the question necessarily arises whether the James Pollock account should not be treated in this proceeding as in evidence for the purpose of showing the payments on account of the life tenant, as well as the receipts, under the well settled rule that when a party gives, in evidence, entries in a book to show his receipt of money, the items of payment are deemed, in evidence, to surcharge the claim, and yet it is practically impossible to say what was intended by the respective parties regarding this admission, and while it is doubtless true that the executors gave evidence to prove many items which would seem to be covered by the admission upon this theory, yet it is urged with great earnestness, and apparent sincerity, on behalf of the executors, that James Pollock's account was put in evidence for all purposes, by the contestant, while it is equally clear that the auditor has only regarded the admissions as establishing the amount of money received by the executors of James Pollock, and of Jane Pollock, without affording even a presumption in favor of the executors as to the payments made by them in this estate, and I cannot escape the conviction that this accounting has been conducted and determined upon some misunderstanding respecting the

rights of the respective parties, and the more I examine the case, the more convinced I am that the matter must be sent back for further consideration.

In the very elaborate and able argument of the learned counsel for the executor Lillienthal, he criticises somewhat the disallowance by the auditor of numerous checks, alleged to have been drawn by the executor Lillienthal, for the benefit of Mrs. Pollock, together with numerous alleged payments to workmen, for taxes, &c., because they are not proved to have been drawn and made for the benefit of the life tenant, and sufficient vouchers were not presented to entitle them to be allowed, and some strictures are made as to the rigidity of the rule adopted by the auditor in respect to the character of the vouchers and the proof necessary to the allowance of the claims.

It is not my purpose to lay down any rule for the guidance of the auditor, who shall have the investigation of this account, if it shall be again referred, nor would I relax the rule of proof demanded of executors and administrators in respect to their disbursement, so as to encourage a lax performance of their duty, or endanger the estate they represent; but it is worthy of consideration whether the representative of an estate, situated as Mr. Lillienthal was, should be held to the rigid rule of proof which is required of a creditor of the estate, to establish his claim on contest.

In this case, Mrs. Pollock, the life tenant, resided in Ulster County, mainly, having a household and large establishment to carry on, and was in the habit of re-

ceiving money from the executor, sometimes through the agency of James Pollock, a clerk of Mr. Lillienthal, sometimes from Mr. Brown, her agent and son-in-law, sometimes personally from Mr. Lillienthal, sometimes by messengers, and at other times her personal bills were paid either by the executor, his clerk, or her daughter, or son-in-law, Brown, rendering it almost, if not quite, impracticable to secure vouchers in each case from the life tenant, and it is manifest that if the rule shall not be relaxed in favor of the representative of an estate under such circumstances, injustice will be done, and a serious obstacle to the assumption of such trusts be presented.

I will entertain a motion on the part of the executors to send the matter back for further hearing, or for reference to another auditor, as they shall be advised.

Order accordingly.