WESTCHESTER COUNTY.—HON. OWEN T. COFFIN, SURRO-
GATE.—March, 1882.

## BOULLE v. TOMPKINS.

*In the matter of the estate of* WILLIAM LONGSTAFF,
*deceased.*

The testator, who died in 1877, leaving real and personal estate, by his will
(1) gave all to his wife for life, with remainders over to his children
and grandchildren; (2) directed his executors to carry on his business
as a tinsmith, etc., for the benefit of his wife during her life, with
power to dispose of the stock in trade for her benefit; and (3) gave his
store, shop, tools, fixtures, and stock in trade, after her death, to a
grandson. Testator left business book accounts, due him, of over
$13,000, of which the executor collected about half, and mostly in-
vested the same, paying to the widow interest on the investments, and
- profits of the continued business. At her death in 1881, the aggregate
amount invested in the business was found to be $1,300, of which
$1,100 was cash derived from the book accounts, and $200 was due
for goods purchased. On the executor's accounting, it was contended
by the legatees that this loss of $1,100 should fall, not upon them, but
upon the executor personally. *Held,*

1. That, under the circumstances, the testator must be held to have in-
tended the sums collectible on those accounts to be used, so far as nec-
essary, to carry on his business, it not being feasible to continue the
same successfully, without any cash capital; and that the executor,
having been guilty of no breach of trust, was entitled to reimburse
himself for the loss of $1,100 out of the fund employed in the business
at the testator's death.

2. That the debt of $200 stood upon the same footing, it being impossible
for him to speculate as to the time, and cease business in anticipation,
of the death of the tenant for life.

THIS was a hearing of objections upon the judicial
settlement of the account of Edward M. Tompkins, ex-
ecutor, etc., of decedent.

The testator, in his lifetime, was engaged in the busi-
ness of a tinsmith and stove-dealer, in the village of
New Rochelle. He died in 1877, seized of several par-

cels of real estate, and possessed of considerable personal property, the use of the whole of which he gave, by his will, to his wife, with remainder over to his children and grandchildren.   Among other provisions, he devised to his grandson, Myron E. Boyd, to take effect at the death of the widow, the lot with the buildings thereon, owned and used by him as a store and workshop for carrying on his business.   He then provided :

" *Sixth.* I direct my executor to carry on my business as a tinsmith and stove-dealer, for the benefit of my wife, Hannah Longstaff, as. long as she lives ; also giving him full power to dispose of the stock in trade of said store, if he deem it necessary for her benefit during her lifetime ; and at her decease, I give the business of said store, and all the working tools and fixtures used by me as a tinsmith and stove-dealer in said store, and all the stock in trade remaining in the store after my wife's decease, to the aforesaid Myron E. Boyd."

At the time of testator's death, there were book accounts against customers, growing out of the trade, to the amount of over $13,000, of which about $7,000 was subsequently collected by the executor.   During the life of the widow, who died in 1881, the executor paid her interest on the collected book accounts, which were chiefly invested by him, and more or less of estimated profits of the business ; but whether she was paid more or less than the actual profits did not distinctly appear. After her death, however, it was found that the amount, in the aggregate, invested in the business, was $1,339.79, of which $1,113.56 was cash derived from the book accounts, and $226.23 was due for goods theretofore purchased.   On the executor's accounting, the legatees

objected that he had no authority to use the proceeds of the book accounts, to carry on the business.

MARTIN J. KEOGH and J. W. BOOTHBY, *for executor.*

C. E. KENE and ROOSEVELT & BANKS, *for Henry E. Boulle.*

THE SURROGATE.—It is a little remarkable that no case like this can be found in the reports in England or this country, which determines the question here presented. There are numerous cases, however, between creditors and the executors, where the will authorized the carrying on of the trade of the deceased after his death. Such were the cases of *Exp.* Garland (10 *Vesey*, 119) ; *Exp.* Richardson (3 *Maddock*, 138) ; Thompson *v.* Andrews (1 *M. & K.*, 116) ; Cutbush *v.* Cutbush (1 *Beav.*, 184) ; Sherman *v.* Robinson (43 *Law Times*, 372) ; Owen *v.* Delamere (*Law Rep.* 15 *Equity*, 134) ; Fairland *v.* Percy (3 *Law Rep. P. & D.*, 217) ; McNeillie *v.* Acton (4 *De Gex, M. & G.*, 744), decided by the English courts ; and Burwell *v.* Mandeville's Executor (2 *How. U. S.*, 560), and Ferry *v.* Laible (31 *N. J. Eq.*, 566 ; S. C. on appeal, 32 *Id.*, 791), determined by American courts. In all these cases, the question considered and determined was what property of the estate the creditor of the continued trade could resort to, for the recovery of his debt ; and it was generally held, and such seems to be the current of authority, that while the executor was personally liable for the debts, the creditors, if necessary to secure themselves, had a remedy against the goods employed in the trade, and also against the fund or assets authorized to be used in the trade, but not against the other assets and property of the estate. Hence, the

*dicta* of the learned judges in those cases must be read in the light of the facts before them. It is undoubtedly a well established principle, both at the common law and under our statute, that an executor shall gain nothing by the increase of the estate through his efforts, nor lose anything by its diminution without his fault. Here, I think, the whole question hinges upon the proper application of this principle. It does not arise between him and a creditor of the trade, but between him and the legatees under the will; and in this lies the novelty of the question. True, this difference may be of little moment, so far as the solution of the difficulty may be concerned, for the rights of creditors and legatees may be regarded as upon substantially the same footing.

In McNeillie *v.* Acton (*supra*), Lord Justice TURNER, said, " Looking at the language of this will, containing, as it does, merely a direction to continue the trade, without any specific direction as to the assets which are to be employed in it, I am satisfied that it was not the meaning of the testator that any portion of his assets *beyond that which was employed in the trade at the time of his death*, should be considered as *the fund* for carrying it on after his death." This is the doctrine laid down in most of the cases, but none of them define what are *assets* so employed which constitute such *fund*. None of them discuss the question, whether the debts, or book accounts due the testator on account of the business at the time of his death, constitute a part of such assets or fund. In *Exp.* Richardson (*supra*), however, where the testator was member of a partnership, which by its articles, had several years to continue when he died, and which provided that, in case of the death of either partner, he

should appoint, by will or otherwise, a successor; and the testator did by will appoint his wife and others, his executors, his successors, to carry on the business, which was that of timber merchants in Liverpool, the executors refused to act, but the widow qualified, and with the surviving partner carried on the business until the firm became bankrupt; the question was whether the estate *outside of what the testator had employed in the business* was liable to creditors of the firm, so constituted, and the court held that all that was meant to be left to carry on the trade, was *the capital of the trade*, and that the executrix was not authorized to employ one shilling of the assets beyond *the capital*. Undoubtedly, the debts due the firm, in whatever form, the cash and stock of timber, etc., on hand at the testator's death, were a part of the capital, as was also the testator's share of the net earnings. Had there been no such arrangement to continue the business, all the testator's interests in the copartnership would have been, at his death, assets belonging to his estate, subject, of course, to the rights of the surviving partner, and the creditors of the firm, if any.

In *Exp.* Garland, it was held that where the will directed a limited sum, beside the property actually employed in the business at the testator's death, to be paid by the executors for the purpose of carrying on his trade (he being a sole trader), the general assets, beyond that *fund*, were not liable. So in Burwell *v.* Mandeville's Executor (*supra*), Judge STORY decided that where the will directed that the testator's interest in a copartnership should be continued therein until the expiration of the term limited by the articles, the remedy of the

creditors was limited to *the funds embarked in that trade.*

The ordinary meaning of the word *fund*, according to Webster, is "a stock or capital; a sum of money appropriated as the foundation of some commercial or other operation, undertaken with a view to profit, and by means of which expenses and credit are supported; and hence the word is applied to the money which an individual may possess, or the means he can employ for carrying on any enterprise or operation. No prudent man undertakes an expensive business without funds." Now, what was the intention of the testator in this regard, as ascertained from the will and the surrounding circumstances. He directed this trade to be carried on for *the benefit* of his widow. It was a business in which he had given credit largely, as there were book accounts due to him, growing out of the trade, to the large amount of nearly $14,000. The trade could not, therefore, be advantageously carried on so that the widow should derive a benefit from it, without a cash capital. So much of the book accounts as were collectible, if available for that purpose, would constitute such cash capital; and would undoubtedly have been necessarily used by the testator, had he lived, to carry on his business successfully. These credits, in the shape of book accounts due to the trade, were, therefore, I think, intended by the testator to be used, so far as necessary, for the carrying on of the business. Besides this, it was evidently his intention, that at the death of his widow, his grandson, Myron E. Boyd, should at once step into a business in successful operation. This could hardly have been accomplished, had there been an attempt to carry it on without any cash

capital whatever.   His intention that his grandson should
continue the business of his life, is further manifested by
his devising to him the lot, store and workshop where
he had carried on the trade.   I am, therefore, of opinion
that the executor had a right to employ the avails of the
book accounts, so far as necessary, to carry on the trade
as directed by the will, as they were set apart by the tes-
tator for that purpose, not only as being a part of the
fund used by him in that trade, but also because of his
intention to that effect, as derived from other provisions
of the will to which allusion has been made.

This provision of the will, resulting as it did in a loss,
does not seem to have been a very wise one ; but, as
Vice-Chancellor SHADWELL once remarked, "Every tes-
tator, by the law of the land, is at liberty to adopt his
own nonsense in disposing of his property."   It is
claimed that this loss, amounting to about $1,100, should
not fall upon the legatees, but upon the executor person-
ally.   This view would be just, provided the executor
had been guilty of a breach of his trust, but, as I have
endeavored to show, he was simply, and in good faith,
obeying the directions given to him by the will.   True,
he might have refused to qualify, and thus saved him-
self from vexation and trouble, ill compensated by his
commissions. - But he did undertake the duties of the
office, and, for aught that appears, discharged them
faithfully.   In Ferry *v.* Laible (32 *N. J. Eq.*, 791), the
court says, "for what they do in obedience to their trust
the executors are entitled, in equity, to be indemnified
out of the property lawfully embarked in the business."
This seems to be just and reasonable ; and, adopting this
principle, the executor may be reimbursed out of the

fund employed in the business at the time of the testator's death. There was collected of the book accounts resulting from the trade about $7,000, thus presenting ample means to indemnify him.

It seems to me, too, that the debt of $226.23, incurred by the executor in carrying on the trade, which was outstanding at the death of the widow, and paid by him, stands upon the same footing as the preceding item. It accrued during the life-time of the widow, and immediately upon her death, all of the stock in trade, tools, etc., by the terms of the will, became Boyd's. The executor could not speculate as to the time of the death of the widow, fix a certain time for her to die, and cease to carry on the trade in anticipation of the event happening at that time, but was obliged to continue it down to the time of its actual occurrence.

The widow should have been paid the profits of the business annually, if there were any, and then, when there were none for any particular year, or the business was conducted at a loss, of course she was entitled to nothing. The account of proceedings filed is not very clear on the subject, but this theory will account for her having been rightfully paid some profits, when there was, on the whole, a loss.

A decree should be entered in accordance with these views, and, as the question is a novel one, costs are allowed to the executor, with a suitable allowance to both parties, based upon the usual affidavits.