WESTCHESTER COUNTY.—HON. OWEN T. COFFIN, SURROGATE.—March, 1884.

DANNAT V. JONES.

*In the matter of the judicial settlement of the account of* JOHN J. JONES *and* ALEXANDER THAYER, *as executors of the will of* DAVID JONES, *deceased.*

Testator, by his will, gave all his estate, real and personal, in shares of equal fifths, to his executors, in trust to take possession of and hold the realty, and keep the personalty invested, and pay the net proceeds to life beneficiaries, with remainder over ; further authorizing the executors "to continue the business of brewing and malting which I am now conducting, upon the same premises I now occupy . . . . . . and with the fixtures and personal property connected therewith, for such time after my decease as they shall think most advantageous to my estate"—the profits to be distributed as above provided. The executors having, in their discretion, continued the business, a contest arose upon their accounting as to whether sundry items were chargeable against income or capital.— *Held,*

1. That the fact that the executors were authorized to carry on the business with a part of the property did not interfere with their final liability to account for and pay over its value, as inventoried, to the beneficiaries in remainder.

2. That they were bound to produce an income which should equal or exceed the usual rate of interest, or in default thereof, to close the business.

3. That expenses incurred in paying wages of operatives, collecting accounts, procuring discounts, "trade raising," for signs, and losses owing to credits justifiably given by the executors, and to death or deterioration of stock used in the business, were chargeable to income, and must be paid and made good thereout, before the shares therein of the life beneficiaries could be ascertained.

The will directed the executors to keep the realty in proper and suitable repair.—

*Held,* that permanent improvements, beyond what the will contemplated would be properly chargeable to the *corpus* of the estate,—the case not being one for apportionment between life-tenants and remainder-

men, since the life beneficiaries were merely legatees of the rents, issues and profits.

Davis v. Stover, 58 *N. Y.*, 473; Matter of Pollock, 3 *Redf.*, 100,118—distinguished.

DAVID JONES died in January, 1881, leaving a last will and testament, which was duly admitted to probate. By it, he first gave to his executors, in trust, his real and personal estate, in the following language :

"*Second.* I give, devise and bequeath to (naming them), executors of and trustees under this my will, one equal fifth part of all my estate, real and personal . . . . to have and to hold the same to them and to the survivors and survivor of them, for and during the life of my sister Mary, wife of George W. Griffith, in trust, nevertheless, to take possession of the real estate, keep the same in proper and suitable repair, keep the buildings thereon well insured, and to let or lease the same from time to time and for such term of time, within the lifetime of my said sister Mary, as to them shall seem best, for the best rent that can be obtained for the same; to keep the personal estate safely and securely invested, and to collect the rents and profits of the real estate and the dividends, interest and income of the personal estate, and, after paying the expenses of repairs, assessments, insurance, and all other necessary and legal charges and expenses, pay over the residue or net proceeds of said one fifth part of my estate so given in trust as aforesaid to my said sister Mary . . "; and made like disposition of one fifth of said income to each of four other brothers and sisters, and upon the death of each brother or sister, the share producing his or her income was given to his or her descendants.

By the eighth clause of the will, he provided as follows :

"*Eighth*. And further I hereby authorize and empower my said executors, the survivors and survivor of them, to continue the business of brewing and malting, which I am now conducting, upon the same premises I now occupy in the city of New York, and with the fixtures and personal property connected therewith, for such time after my decease as they shall think most advantageous to my estate . . . "; the profits to be distributed as before provided.

Between the time of the making of the will and the testator's death, he became the owner of several other breweries situated in New York city, Westchester county and New Jersey, which he was operating. The inventory filed, embracing the chattels, etc., in and about these various breweries, and also all of his other personal estate, fixed its value at about $3,336,000.

The executors, exercising the discretion conferred upon them, continued the business in some or all of the breweries, and in their accounts of proceedings filed herein made certain charges against income, which the life beneficiaries claimed should, instead, be charged against capital.

MARTIN J. KEOGH, *for the executors.*

MARSH, WILSON & WALLIS, *for Margaretta Jones, life beneficiary.*

R. S. EMMET, *for Susan J. Dannat, do.*

SMITH & WOODWARD, *for Mary J. Griffith, do.*

THE SURROGATE.—The element of difficulty arises from the power given to the executors, by the will, to

continue the business. Had they been authorized to invest the personal estate and to pay over the income to the beneficiaries for life, with remainder over, the duty would have been an ordinary and simple one. The *corpus* of the estate should then have been kept properly invested and preserved intact for the legatees in remainder. If, however, any loss had been incurred without the fault of the executors, the capital would have been diminished to that extent, and the income lessened accordingly. It is to be supposed they would have sold and converted the personal estate for the amount at which it was inventoried, and for that sum the legatees in remainder would ultimately have called upon them to account. Those legatees, had, in fact, at the death of the testator, a vested interest in all of the estate left by him.

Does the fact that the executors were authorized to carry on the business with a part of the property in any way interfere with their final liability to account for and pay over its value, as inventoried, to those entitled to it? In other words, if the property embarked in the business, or any part of it, shall be diminished in value, or lost, while properly employed in earning an income for the beneficiaries for life, must not the loss be made good out of the income? It would certainly seem that it must. If a horse died, a wagon were destroyed, or beer became worthless, during the period of conducting the business, which might have been sold in the usual course of administration at the inventoried prices, it would seem no more than just to the legatees in remainder, that the losses should be made good out of the profits of the business. Presumably, it was not the

intention of the testator, by this provision of his will, to diminish the bulk of his estate for the benefit of those entitled to the income, but on the contrary to keep it intact, and also to furnish an income which should equal or exceed the usual rate of interest. In case this was not accomplished, it was, doubtless, the duty of the executors, in the exercise of a wise discretion, to have closed the business and converted the property employed in conducting it into money, which they would have invested in a manner more profitable to those interested. To have acted otherwise would have been a clear violation of the expressed wish of the testator to continue the business "for such time after my decease, as they shall think most advantageous to my estate." He speaks of the estate which he should leave at his death; and could not have intended that income should be increased at its expense.

It is assumed, nor does it seem to be denied, that, after the deductions claimed by the executors, the net profits, amounting in two years to about $158,000, exceed the usual rate of interest on the sum invested. Hence, the executors may fairly claim that they were justified in continuing the business. Nevertheless, the life beneficiaries are entitled to the net profits, however large they may be. At the same time they are entitled only to such profits. They cannot expect to have them swelled by adding to them any part of the capital. If a horse, or any other property, used in the business at the time of the death of the testator, were rendered less valuable, or died or were worn out in producing income, income should restore it, just as much as it

should repair the implements of a handicraft used for a like purpose.

I understand it to be claimed by counsel for one of the contestants that even the wages of the operatives in the breweries should have been paid from the capital, and he cites, as authority for this, the case of Davis v. Stover (*58 N. Y., 473*). The case does not seem to me applicable. There the charge was for services rendered to the representative of a fund, and the question was whether he were liable individually or as such representative. There, it was the same as if the executor were to hire an auctioneer and others to aid in disposing of and converting property of the testator, in a case of simple administration; he would pay them out of the fund, and the payment so made would be allowed and deducted from the fund, as just necessary expenses. The question was rather one between employer and employed, and as to the capacity in which the former was liable. So it might be here, in so far as the property employed in brewing and malting is concerned, as between the operatives and the executors. But that is not this case at all. Here it is between the executors and the legatees, and the analogy fails.

Suppose this estate had consisted wholly of bonds and mortgages which were frequently paid in and reinvested, such expenses as might be incurred therein would be chargeable to income and not to the *corpus* of the estate. Nor is this case like *In re* Pollock (*3 Redf.*, 100, 118). That related to a change of investment and its consequences; this, to the restoration of property damaged or consumed by use.

At the time of testator's death, he had large sums

due to him, in the form of book accounts and otherwise, a large part of which the executors were unable to collect. The losses incurred thereon were not properly chargeable to income, but to the body of the estate, and it is claimed by the executors that they are so charged. They are right, however, in charging against income all losses of that description incurred, without their fault, while they were conducting the business. The beneficiaries for life had no duty to perform, such as would devolve upon a principal or a partner. They sat with their hands folded in this regard while others toiled for them. That was so decreed by the testator ; and he also decreed that they should have the profits. This, of course, means the net profits. *All* losses, charges and expenses incident to the business had to be first paid, before their shares could be ascertained. In short, the capital had to be kept good, at the expense of the income. To have done otherwise would, I think have been a violation of duty on the part of the executors, and if persisted in might have ended disastrously to all the parties.

Considerable sums of money were expended by the executors for what is called "trade raising," and for signs. This trade raising consisted of the expenditure of money by employees in treating customers and others, with a view, doubtless, to extending the good will and enlarging the business. It seems to have been a custom of the trade. The signs also were procured and used, it is presumed, for a like purpose. Clearly, if these expenditures tended to increase income, they are properly chargeable against it. Expenses of collecting accounts, and discounts charged, were incident to the

business and are, therefore, chargeable against income.

No evidence has been yet taken in regard to any of the items involved. The matter is simply submitted in order that certain general principles shall first be determined. As it does not, as yet, distinctly appear that the executors have, in conducting the business, violated any rule of law laid down in the case of Boulle v. Tompkins (5 *Redf.*, *472*), by using unauthorized capital, it is impossible to consider it at this stage of the case.

All that is important in reference to the purchase and sale of U. S. bonds is to see that there shall be no loss of income, by reason of the transaction, to the life beneficiaries. They have no right to any sum added to the corpus of the estate by the operation. Whatever was so added would, of course, tend to increase their income.

Certain items of expenditure, in regard to repairs, etc., to real estate, are charged by the executors against income. This is objected to by the contestants, who claim that they should be either charged wholly against capital, or apportioned between the beneficiaries for life and the remaindermen. The will directs the executors to keep the real estate in proper and suitable repair and to keep the buildings thereon well insured, "and, after paying the expenses of repairs, assessments, insurance, and all other necessary and legal charges and expenses, pay over the residue or net proceeds" to the life beneficiaries. Thus, the will itself answers the objection. If, however, permanent improvements were made, beyond what the will contemplated, they would be properly chargeable to the body of the estate. It would not be a case for apportionment between

tenants for life and remaindermen, as the beneficiaries for life are not tenants at all, but simply legatees of the rents, issues and profits. They have no title of any kind to the real estate.

I have thus endeavored to settle the principles on which I think the accounting should proceed. In case anything shall have been overlooked, it can be disposed of on the further hearing of the matter.